## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

Case No.  08-32900

DAVID MARSHALL WHISNANT
f/d/b/a DAVID WHISNANT CONSTRUCTION

Debtor

REGIONS BANK,
f/k/a AMSOUTH BANK

Plaintiff

v.                                                  Adv. Proc. No.  08-3161

DAVID MARSHALL WHISNANT

Defendant

## M E M O R A N D U M

**APPEARANCES:**    WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
                    Walter N. Winchester, Esq.
                    Joshua R. Holden, Esq.
                    Post Office Box 2428
                    Knoxville, Tennessee  37929
                    Attorneys for Plaintiff

                    LAW OFFICES OF MAYER & NEWTON
                    John P. Newton, Jr., Esq.
                    1111 Northshore Drive
                    Suite S-570
                    Knoxville, Tennessee  37919
                    Attorneys for Defendant/Debtor

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint For Nondischargeability of Debt (Complaint) filed on November 11, 2008, by the Plaintiff, Regions Bank, requesting a judgment against the Defendant in the amount of $431,637.00 plus interest, costs, and attorneys' fees,[1] as well as a determination that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(B) (2006).

The trial was held on August 3, 2009.  The record before the court consists of twenty-nine exhibits introduced into evidence, together with the testimony of two witnesses, John Thomas McMahan, Vice President, Regions Bank's Homebuilder Finance Division, and the Debtor.

This is a core proceeding.  28 U.S.C. § 157(b)(2)(I) (2006).

## I

On January 20, 2006, the Defendant entered into two Builder Construction Agreements (Agreements) with Amsouth Bank, predecessor in interest to the Plaintiff, in connection with his development of a subdivision in Knox County, Tennessee.[2]  Under one Agreement, the Plaintiff agreed to loan the Defendant $2,138,400.00 for a two-year term expiring on January 20, 2008, to allow him to purchase several lots essential to the construction of the subdivision to be known as Carpenter Ridge, which was to consist of single-family residences (Purchase Loan).  TRIAL EX. 1. In connection with the Purchase Loan, the Defendant also executed a Builder Promissory Note in the amount of $2,138,400.00, designated as Loan # 53-0001045000-0000613034.  TRIAL EX. 3.  The

---

[1] *See*, *infra* n.3.

[2] All references to "Plaintiff" herein includes both Regions Bank presently and Amsouth Bank prior to its merger with Regions Bank.

2

Purchase Loan was guaranteed, in part, by Scott Davis, the individual from whom the Defendant was

purchasing the lots.  TRIAL EX. 7.

Under the other Agreement, the Plaintiff agreed to loan the Defendant $2,200,000.00 for a

one-year term expiring January 20, 2007, for the construction of the single-family residences on the

lots acquired by the Defendant under the Purchase Agreement (Construction Loan), against which

the Defendant was authorized to take periodic draws as work was completed.  TRIAL EX. 2.  As with

the Purchase Loan, the Construction Loan was evidenced by the Defendant's execution of a second

Builder Promissory Note in the Plaintiff's favor in the amount of $2,200,000.00, designated as Loan

# 53-0001045000-0000612994.  TRIAL EX. 4.  To secure both the Purchase Loan and Construction

Loan, the Defendant executed a Builder Construction Deed of Trust, Assignment of Rents and

Security Agreement granting the Plaintiff a lien in the lots being purchased and in the houses to be

constructed on these lots.  TRIAL EX. 5.

The parties had a prior business relationship as the result of a loan obtained by the Defendant

from the Plaintiff in 2004, associated with the Defendant's development of another residential

project known as the Oakleigh Subdivision.   In association with the loan for the Oakleigh

Subdivision project, the Defendant had provided the Plaintiff with the following financial

documents:  (1) an Individual Income Tax Return for 2002, evidencing adjusted gross income of

$107,041.00 and a $33,564.00 tax liability; (2) an Individual Income Tax Return for 2003,

evidencing adjusted gross income of $190,915.00 and a $58,092.00 tax liability; (3) a Personal

Financial Statement dated December 1, 2003, signed by the Debtor on December 15, 2003, listing

total assets of $2,733,000.00 and total liabilities of $1,170,000.00; (4) a Personal Financial Statement

3

dated December 1, 2004, listing total assets of $4,307,000.00 and total liabilities of $2,278,200.00; and (5) a Certification of Financial Statement executed by the Defendant on December 2, 2004, certifying the accuracy of the December 1, 2004 Financial Statement.  TRIAL EX. 16; TRIAL EX. 15; TRIAL EX. 22; TRIAL EX.20; TRIAL EX. 21.

In connection with the loans on the Carpenter Ridge project, the Plaintiff relied upon the documentation provided by the Defendant during the Oakleigh project loan process as well as the Defendant's Individual Income Tax Return for 2004, prepared jointly with Patricia Hudson, evidencing adjusted gross income of $318,568.00 and a $100,532.00 tax liability.  TRIAL EX. 14. Additionally, because the Defendant obtained ongoing draws on the Construction Loan, the Plaintiff required periodic updated financial information, which was provided by the Defendant as follows: (1) an Individual Income Tax Return for 2005, prepared jointly with Patricia Hudson, evidencing adjusted gross income of $335,379.00 and a $107,303.00 tax liability; (2) an Individual Income Tax Return for 2006, prepared jointly with Patricia Hudson, evidencing adjusted gross income of $231,255.00 and a $6,404.00 tax liability; and (3) a Personal Financial Statement dated June 1, 2006, listing total assets of $5,326,300.00 and total liabilities of $2,459,000.00.  TRIAL EX. 13; TRIAL EX. 12; TRIAL EX. 19.  The Plaintiff continued advancing funds from the Construction Loan through August 2007, and the total amount ultimately borrowed by the Defendant for construction was $2,800,000.00.  *See* COLL. TRIAL EX. 9.

In January 2008, the Defendant abandoned work at the Carpenter Ridge project site and defaulted under the terms of the Purchase Loan and Construction Loan, leading to a foreclosure of the property by the Plaintiff.  The Defendant, thereafter on July 3, 2008, filed the Voluntary Petition

commencing his Chapter 7 bankruptcy case. The Plaintiff is now an unsecured creditor, with a claim filed in the amount of $431,637.00. TRIAL EX. 27. The Plaintiff timely filed the Complaint initiating this adversary proceeding on November 11, 2008, and the Defendant filed an Answer on December 16, 2008. Pursuant to the Pretrial Order entered on January 30, 2009, the issues before the court are as follows:

(1) Whether the Complaint fails to state a claim pursuant to 11 U.S.C. § 523(a)(2)(B)?

(2) Whether any financial statements, tax returns and/or documents respecting the debtor's or an insider's financial condition were provided to the Bank by Mr. Whisnant?

(3) If Mr. Whisnant provided any financial statements, tax returns and/or documents to the Bank respecting the debtor's or an insider's financial condition, whether such financial statements, tax returns and/or documents omit, exclude, conceal and otherwise do not disclose the debtor's true financial condition?

(4) Whether any financial statements, tax returns and/or documents provided to the Bank respecting the debtor's or an insider's financial condition by Mr. Whisnant were statements in writing, prepared, adopted or signed by Whisnant, that were materially false respecting the debtor's or an insider's financial condition?

(5) Whether Mr. Whisnant caused any financial statements, tax returns and/or documents respecting the debtor's or an insider's financial condition to be published with the intent to deceive?

(6) If the Court determines that written financial statements, tax returns and/or documents respecting the debtor's or an insider's financial condition were provided to the

5

Bank by Mr. Whisnant, whether the Bank reasonably relied on said financial statements and documents in making the decision to extend credit or otherwise loan money to Mr. Whisnant?

(7) If the Court determines that written financial statements and documents respecting the debtor's or an insider's financial condition were provided to the Bank by Mr. Whisnant and that such financial statements and documents were materially false, whether Mr. Whisnant is entitled to a discharge of his indebtedness to the Bank pursuant to 11 U.S.C. § 523(a)(2)(B)?

(8) Whether Regions Bank should be granted a money Judgment against Mr. Whisnant in the amount of $431,637.00, plus interest as it continues to accrue, the costs of this cause, and a reasonable attorney's fee?[3]

(9) If the Complaint is dismissed, whether the Defendant is entitled to his legal fees and/or expenses pursuant to 11 U.S.C. § 523(d)?[4]

---

[3] During the course of the trial, the Plaintiff withdrew its request for a monetary judgment and only seeks a determination of dischargeability.

[4] Section 523(d) has application only to consumer debts which are determined to be dischargeable and is, therefore, not relevant to this adversary proceeding.

6

**II**

Dischargeability of debts is determined under the direction of 11 U.S.C. § 523(a), which, as material to the Plaintiff's action, provides that an individual debtor does not receive a discharge under 11 U.S.C. § 727(a) (2006)[5] of the following kind of debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> . . . .
>
> (B) use of a statement in writing—
>
> > (i)  that is materially false;
> >
> > (ii)  respecting the debtor's or an insider's financial condition;
> >
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> >
> > (iv)  that the debtor caused to be made or published with intent to deceive . . .[.]

11 U.S.C. § 523(a)(2)(B).  In summary, a determination of nondischargeability under § 523(a)(2)(B) requires proof that the Plaintiff loaned money after it reasonably relied upon false financial documents concerning the Defendant and/or an insider which were provided by the Defendant either directly or indirectly, and that the Defendant intended to deceive the Plaintiff when doing so, and unless all of the statutory criteria are satisfied, the debt will be discharged.  *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 780 (Bankr. E.D. Tenn. 2003).

---

[5] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title[.]" 11 U.S.C. § 727(b) (2006).  This accomplishes the goals of Chapter 7 to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start" through this discharge.  *Buckeye Retirement, LLC v. Heil (In re Heil),* 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt*, 54 S. Ct. 695, 699 (1934))).

As the party seeking the determination of nondischargeability, the Plaintiff bears the burden of proving all elements by a preponderance of the evidence, *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991); however, § 523(a) is construed liberally in favor of the Defendant and strictly against the Plaintiff. *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998); *Copeland*, 291 B.R. at 759. "[B]ankruptcy courts should examine the underlying nature of a debt, no matter what its form, when the dischargeability of the debt is in question[.]" *Burrell-Richardson v. Mass. Bd. of Higher Educ. (In re Burrell-Richardson)*, 356 B.R. 797, 802 (B.A.P. 1st Cir. 2006).

## A

The parties do not dispute that the Plaintiff made the Purchase Loan and the Construction Loan to the Defendant in association with the Carpenter Ridge project. Nevertheless, even though the loans were made on the same date, January 20, 2006, they were separate loans which were used for two distinct purposes, and the court must determine whether the Plaintiff's claim in the Defendant's bankruptcy case includes funds of one or the other or both in order to determine the underlying "money obtained" by the Defendant for its § 523(a)(2)(B) analysis.

As Mr. McMahan testified, the Purchase Loan was disbursed in full at closing and paid to Scott Davis, the owner of the real property, while the Construction Loan was disbursed as work was completed and draws were requested by the Defendant. Mr. McMahan testified that once the Defendant defaulted and the Carpenter Ridge property was foreclosed, the proceeds were applied first to the Construction Loan which was satisfied in full, and that the Plaintiff's claim represents the

8

remaining balance of the Purchase Loan.  Collective Trial Exhibit 9 substantiates this testimony,

evidencing that the $2,138,400.00 Purchase Loan, #5-00010450000-0000613034, was disbursed on

January 20, 2006, and that the $436,756.72 due on June 11, 2008, after foreclosure, consists wholly

of the unpaid principal balance owing on the Purchase Loan in the amount of $428,121.06, interest

on the Purchase Loan in the amount of $1,423.44, and late fees in the amount of $7,212.22.  COLL.

TRIAL EX. 9.  Likewise, the final attachment to the Plaintiff's proof of claim, Exhibit C, confirms

this as well, evidencing that the $431,637.00 claim as of August 11, 2008, consists of the post-

foreclosure deficiency balance of $428,476.92 and interest in an aggregate amount of $3,160.08.

TRIAL EX. 27.

Based upon Mr. McMahan's testimony and the Plaintiff's documentation, the underlying debt

comprising the Plaintiff's claim, upon which it seeks a determination of nondischargeability, is the

Purchase Loan, which was executed by the Debtor and disbursed in its entirety on January 20, 2006.

Therefore, only documentation provided by the Defendant prior to January 20, 2006, and relied upon

by the Plaintiff in making the Purchase Loan could have possibly been used by the Defendant to

induce the Plaintiff to loan him the $2,138,400.00.  Accordingly, the court will focus upon the tax

returns and financial statements provided to the Plaintiff before January 20, 2006, to determine

whether or not the remaining requirements of § 523(a)(2)(B) are satisfied.

**B**

Section 523(a)(2)(B) applies only to statements actually reduced to writing and produced by

the Defendant to the Plaintiff to induce the loaning of money.  *Copeland*, 291 B.R. at 781.  Whether

a document satisfies the writing requirement does not turn on whether it was prepared by the

Defendant, *Union Planters Bank, N.A. v. Martin (In re Martin)*, 299 B.R. 234, 239 (Bankr. C.D. Ill.

2003); however, he must have either created it, had it created, or allowed it to be "published" by

making it public or circulating it.  *Copeland*, 291 B.R. at 782, 785.  Accordingly, documents from

another source but authorized by the Defendant, as well as any documents personally supplied to the

Plaintiff by the Defendant fall within the scope of § 523(a)(2)(B).  *Copeland*, 291 B.R. at 785.  Here,

the documents at issue are federal tax returns and personal financial statements, all of which were

either prepared or signed by and provided to the Plaintiff by the Defendant, and this factor is not at

issue.

Additionally, the documents in question "may be described as one representing the debtor's

net worth, overall financial health, or ability to generate income so as to enable an accurate

assessment to be made of the debtor's creditworthiness[,]" *Midwest Cmty. Fed. Credit Union v.

Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007), and would include income

statements or paycheck stubs containing materially false statements offering "a substantially

untruthful picture" of the financial condition of the Defendant that significantly affected the

Plaintiff's decision to make the loans.  *Copeland*, 291 B.R. at 782-83.  Statements are materially

false if they contain important or substantial untruths, and "the size of the discrepancy is a key

factor."  *Sharp*, 357 B.R. at 766.  "The measuring stick of material falsity is whether the [creditor]

would have made the loan if the debtor's true financial condition had been known."  *Copeland*, 291

B.R. at 782 (quoting *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D.

Tenn. 2001)).   The concealment or understating of assets or liabilities constitutes material

misstatements, and documents "containing pertinent omissions may qualify as 'materially false' for

purposes of a section 523(a)(2)(B) violation." *European Am. Bank v. Launzel-Pennes (In re Launzel-Pennes)*, 191 B.R. 6, 11 (Bankr. E.D.N.Y. 1996); *Copeland*, 291 B.R. at 782.

Financial statements and tax returns fall squarely within the scope of statements in writing respecting a debtor's financial condition contemplated by § 523(a)(2)(B), so the inquiry shifts to whether they were materially false.  At trial, the Defendant acknowledged that his taxes for 2002 through 2006, in the following amounts:  (1) $33,564.00 owed in 2002; (2) $58,092.00 owed in 2003; (3) $100,532.00 owed in 2004; (4) $107,303.00 owed in 2005; and (5) $6,404.00 owed in 2006, remain unpaid as of the trial date, and that the IRS holds a claim in the amount of $1,256,527.23 for the periods of 2000 through 2007, as evidenced by its amended proof of claim filed May 15, 2009.[6]  *See* TRIAL EX. 11.  Additionally, although arguing that his failure to do so did not render them false or misleading, the Defendant acknowledged that he did not disclose the unpaid tax liability on any of the financial statements tendered to the Plaintiff in connection with his various loans.  He also acknowledged that he executed a Certification of Financial Statement on December 2, 2004, representing that his December 1, 2004 Financial Statement was "correct and complete and accurately reflect[ed] the condition and affairs of the undersigned at the date and for the period(s) stated and that said statements reflect all known liabilities, direct or contingent, as of the date thereof" and that the December 1, 2004 Financial Statement was "delivered to [Plaintiff] to induce it to extend credit from time to time . . . to the undersigned as borrower or guarantor."  TRIAL EX. 21.

---

[6]  The parties dispute whether these tax returns were ever filed by the Defendant with the Internal Revenue Service.  The proof did not conclusively answer this question.

The court does not agree with the Defendant's contention that his failure to disclose to the Plaintiff unpaid taxes due the Internal Revenue Service totaling $192,188.00 for 2002 through 2004 is not materially false or that the Plaintiff should have expressly asked if he had paid the tax obligations evidenced on the tax returns. Both financial statements contain a line item for "Unpaid income tax" and by omitting that figure, the Defendant's total liabilities for both financial statements are inaccurate and his net worth figure inflated. This significant income tax liability is the type of information which could affect a lender's decision, and, as testified to by Mr. McMahan, would have affected the Plaintiff's decision to make the Purchase Loan. Additionally, the Defendant provided the Plaintiff with copies of his tax returns for 2002 through 2004; however, he did not disclose that the taxes remained unpaid. His argument that the Plaintiff should have asked if the taxes were paid is disingenuous, especially in light of his failure to include any outstanding tax liabilities on his personal financial statements. His failure to disclose his tax liability presented a false picture of his financial condition, and the court finds that the two financial statements provided to the Plaintiff by the Defendant were materially false and his failure to disclose that the tax liabilities owing for 2002 through 2004 had not been paid was a material omission. Accordingly, this element of § 523(a)(2)(B) has been satisfied.

## C

Next, the Plaintiff must establish that it actually relied on the written statements furnished by the Defendant prior to making the Purchase Loan and that its reliance was reasonable. *Sharp*, 357 B.R. at 766. At trial, Mr. McMahan testified that the Plaintiff relied upon the documentation provided by the Defendant in making the decision to make the January 20, 2006 Purchase Loan and

Construction Loan, and in support thereof, the Plaintiff introduced into evidence three in-house analyses prepared by its underwriter, Bobby Davis.  *See* TRIAL EX. 23; COLL. TRIAL EX. 24; COLL. TRIAL EX. 35.  Mr. McMahan testified that these documents are compiled by the Plaintiff to aid in the loan application/determination process, to identify trends, and for use as an indicator as to the borrower's ability to repay.

The first analysis, a Personal Financial Statements Worksheet dated January 18, 2006, contains the following "Key Balance Sheet Information" which was derived entirely from the figures provided to the Plaintiff by the Defendant in his 2003 and 2004 financial statements introduced into evidence as Trial Exhibits 22 and 20, respectively:

| Year of PFS | 2003 12/15/2003 | 2004 12/1/2004 |
|---|---|---|
| Total Liquid Assets | 131,000 | 680,000 |
| Total Liabilities | 1,170,000 | 2,278,200 |
| Inside Net Worth | 1,563,000 | 2,028,800 |
| Adjusted Assets | 2,733,000 | 4,307,000 |
| Adjusted Liabilities | 1,170,000 | 2,278,200 |

TRIAL EX. 23.  The Personal Financial Statements Worksheet additionally evidences an "Outside Net Worth as Adjusted" of $1,563,000.00 for 2003 and $2,028,800.00 for 2004, which does not include any figures or adjustments for the Defendant's unpaid income taxes because neither financial statement discloses those liabilities.  TRIAL EX. 23.

The second analysis, a Buker's Taxanalysis Plus Worksheet also dated January 18, 2006, contains a breakdown of the Defendant's tax returns for 2002, 2003, and 2004, and evidences Total

Annual Cash Flow Available to Service Debt of $100,512.00, $147,456.00, and $451,703.00, respectively. Coll. Trial Ex. 24. It does not, however, take into account the Defendant's undisclosed unpaid taxes.[7]

The third analysis, a Module 2 form dated January 20, 2006, outlines the Carpenter Ridge Subdivision project, the Defendant's history with the Plaintiff, and the Defendant's financial information. Coll. Trial Ex. 35. As evidenced by the Closing Conditions and Covenants, the Plaintiff required annual financial statements and tax returns from the Defendant, upon which it relied to prepare an internal income assessment of the Defendant. Coll. Trial Ex. 35. Beginning at page 12 of the Module 2 form, the Plaintiff includes the following breakdowns:

Income & Expenses

Based on information in the tax returns from 2001 through 2004, income and expenses for Mr. Whisnant's construction company are shown below:

DMW Construction Income Statement

|  | 2001 | 2002 | 2003 | 2004 | 4-yr growth rate |
|---|---|---|---|---|---|
| Sales | 1,377,090 | 2,475,350 | 3,011,252 | 2,217,111 | 12.64% |
| Cost of Sales | 1,146,825 | 2,329,730 | 2,843,323 | 1,859,324 | 12.841% |
| Gross Profit | 230,265 | 145,620 | 167,929 | 357,787 | 11.65% |
| G&A Expense | 128,291 | 24,366 | 19,381 | 24,196 | -34.10% |
| Net Profit Before Tax | 21,974 | 121,254 | 148,548 | 333,591 | 97.39% |
| Gross Margin | 16.72% | 5.88% | 5.58% | 16.14% | |

**Note**: Preliminary P and L for 2005 indicates a gross profit of $420,000.

---

[7] Because the 2005 tax return was not due on January 20, 2006, the date of the Purchase Loan, the Defendant, arguably, cannot be faulted for failing to disclose his $107,303.00 tax liability for 2005, marked as Trial Ex. 17, because the 2005 return was not due until April 15, 2006, two months after the proceeds of the Purchase Loan had been distributed.

14

While gross margins have decreased in 2002 and 2003, gross profit continued to increase over the four year span.  Mr. Whisnant has obviously controlled company expenses well.  The table above shows how this production has initiated considerable increases in his net profit before taxes. . . .

However with the company being a sole-proprietorship, the personal and company expenses are co-mingled.  This situation affects business income because it is lowered by an amount equal to the personal expenses and payments to owners.  Therefore, we are mostly concerned with the gross profit margin of the company.  While the four year gross profit average is 11.08%, the 2004 gross margin of 16.14% is considered extremely well for the industry and as previously stated this will continue in 2005.  We will continue to manage the relationship through analyzing company gross profit margin on a yearly basis.  It is also noted per the attached Debt Service Analysis on Mr. Whisnant, that he has calculated overage in excess of $293,000.00 annually.  Preliminary projections for 2005 indicate this type of overage will continue.

Coll. Trial Ex. 35.  This document also contains the following assessments:

Proprietor Analysis

David Whisnant is the sole proprietor of the company and 100% owner.  The proprietor's last two years of information is listed below, with the most recent PFS dated December 1, 2004.

David Whisnant Personal Financial Summary

|  | 12/1/2004 | 12/15/2003 | 1-Yr. Growth |
|---|---|---|---|
| Liquidity | $680,000 | $131,000 | +419% |
| Assets | 4,307,000 | 2,733,000 | +58% |
| Liabilities | 2,278,200 | 1,170,000 | +95% |
| Net Worth | 2,028,800 | 1,563,000 | +30% |
| Leverage | 1.12 | .075 |  |
| Annual Cash Flow | 120,000+ | 120,000+ |  |
| Cont. Liabilities | 2,236,000 | 1,170,000 |  |

**Comments**:  All liabilities related to real estate are reported on Mr. Whisnant's PFS

While liabilities increased considerably, so did Mr. Whisnant's liquidity.  This helped to mitigate some of the risk of increased levels of debt.  Still, the level of debt will be monitored closely by the RM as the subject credit is serviced according to policy.  Mr. Whisnant divested himself from part of his business ventures shown on his previous statements resulting in an increase in his liquidity beyond what his excellent housing year contributed.

15

Personal Financial Statement

Dave Whisnant's assets consist mainly of cash and marketable securities of $680,000
and real estate of $3,627,000.  Mr. Whisnant values the ownership of his business
ventures at present net value and the real estate at fair market value.  The values are
appropriate for the owner's interest in business and fair market values of real estate
in this area.  The 2004 PFS shows a substantial increase in liquidity.  During 2004
Mr. Whisnant realized a $100,000 Fee due to the sale of part of the lots in Oak Leigh
Subdivision.  The remaining increase in liquidity resulted primarily from the increase
in sales from 2003 to 2004.  Mr. Whisnant is currently preparing an updated financial
statement that will likely show somewhat higher liquidity.

Tax Returns/Cash flow

Dave Whisnant's adjusted gross income from his 2003 personal tax return was
$190,915.  Mr. Whisnant had a significant increase in income in 2004, and his
taxable net income per this tax return was $318,568.  This included depreciation of
$10,930, which could be added back to cash flow for a total of $329,498.

COLL. TRIAL EX. 35.  This worksheet also states that because the loan was a "larger commitment

than previously granted, the seller of the property, Scott Davis of Eagle Bend Realty, has agreed to

guarantee the debt" and includes an analysis of his financial information as well.  COLL. TRIAL EX.

35.

Clearly, based upon the testimony of Mr. McMahan and the aforementioned documentation,

the Plaintiff relied upon the financial statements and tax returns provided to it by the Defendant.

Therefore, the next query is whether the Plaintiff's reliance was reasonable, to which the court

answers in the affirmative.  The Plaintiff need not have conducted an investigation prior to loaning

the Defendant money to meet the reasonable reliance standard; rather, the inquiry is whether it made

an "ordinarily prudent choice" in loaning the money.  *Copeland*, 291 B.R. at 785 (citing *Shaw Steel,*

*Inc. v. Morris (In re Morris)*, 223 F.3d 548, 554 (7th Cir. 2000)).  Although the court should consider

the totality of the circumstances when making this determination, the primary questions are "whether

16

there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Copeland*, 291 B.R. at 785 (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993)). Nevertheless, "the court should refrain from a subjective evaluation of the creditor's lending policy and practices and should not base its decision on whether the court, in the creditor's place, would have extended the loan." *Buckeye Ret. Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 423 (Bankr. S.D. Ohio 2008).

Mr. McMahan, who has been in the banking industry since 1975, has been with Regions Bank for a total of twelve years, and is currently a vice president of the Plaintiff's Homebuilder Finance Division, testified that when it receives personal financial statements and tax returns, the Plaintiff does not, as a general practice, ask for additional backup information because it relies upon the representations of its customers as set forth in those documents. Furthermore, with respect to the Defendant, specifically, based upon the parties' prior relationship beginning in 2004 with the Oakleigh project, no additional backup documentation was requested. And even though Mr. McMahan testified that, to the best of his knowledge, the Plaintiff had not sought a 2005 financial statement because the 2004 financial statement was current within the Plaintiff's policy guidelines, the documentation establishes, as Collective Trial Exhibit 35 states, at page 14, that "Mr. Whisnant is currently preparing an updated financial statement[.]" COLL. TRIAL EX. 35.

17

The court finds that the Plaintiff's reliance upon the Defendant's financial statements and tax returns was reasonable. First, as Mr. McMahan testified, it was not the Plaintiff's custom to request backup documentation from its business/construction borrowers without any sort of "red flag" which would call into question the documentation provided. Additionally, the Defendant had fulfilled his obligations to the Plaintiff in connection with the Oakleigh project, and based upon that ongoing lender/borrower relationship, the Plaintiff had no reason to question the validity and veracity of the documents provided by the Defendant. Furthermore, the Internal Revenue Service did not file a tax lien against the Defendant, so even if the Plaintiff had investigated, it would not have discovered the outstanding tax obligations.

The Plaintiff was aware that the Defendant had a credit score of 528, as evidenced in Collective Trial Exhibit 39, the Module 2 form for the Oakleigh project, and, according to Mr. McMahan, this score is deemed low by the Plaintiff. Nevertheless, the Plaintiff's records also reflect that in spite of having "major surgery" and being out of work for several weeks, the Defendant made Oakleigh into a "successful development" and that his "[c]redit ratings have improved on both his personal and NACM reports as it relates to the past 12 months. As is often the case, there was a divorce involved as well." COLL. TRIAL EX. 39 at p. 3. Seeing as the Plaintiff found these factors to satisfactorily explain the Defendant's lower credit score, it raised no red flags calling into question the information contained in the financial documentation provided by the Defendant. This element of § 523(a)(2)(B) has been satisfied.

18

**D**

Finally, the Plaintiff must prove that when the Defendant provided it with the financial statements, he did so with an intent to deceive.  An intent to deceive does not require that the Defendant acted with a "malignant heart."  *Heritage Bank of St. Joseph v. Bohr (In re Bohr)*, 271 B.R. 162, 169 (Bankr. W.D. Mo. 2001) (citations omitted).  While obviously satisfied if actual fraud is proved, in the Sixth Circuit, "'[§] 523(a)(2)(B)(iv) is [also] met if a debtor is reckless when submitting financial statements that he knows are not true, not only if the debtor possesses a subjective intent to deceive.'"  *Copeland*, 291 B.R. at 786 (quoting *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993)).  Furthermore, the intent to deceive may be inferred through the Defendant's actions and is established if he personally submitted or allowed to be submitted financial documents that he knew were untrue, even without a subjective intent to deceive. *Copeland*, 291 B.R. at 786 (citing *Norris v. First Nat'l Bank (In re Norris)*, 70 F.3d 27, 30 n.12 (5th Cir. 1995)); *see also Rosen's, Inc. v. Ghere (In re Ghere)*, 393 B.R. 209, 215 (Bankr. W.D. Mo. 2008) ("Direct evidence of intent rarely exists and courts may look to surrounding circumstances to ascertain intent.").

As previously discussed, the Defendant submitted his tax returns for 2002, 2003, and 2004 to the Plaintiff, as well as financial statements dated December 1, 2003, and December 1, 2004, prior to executing the Purchase Loan documents.  Additionally, he executed a Certification of Financial Statement on December 2, 2004, representing that the December 1, 2004 Financial Statement, which did not reflect any outstanding tax liabilities, was true and accurate.  At no time did he advise the Plaintiff that his tax obligations were outstanding, and although he contended at trial that it "didn't

19

occur" to him to disclose his increasing tax obligations and that the Plaintiff never asked if he had

paid them, the number of misrepresentations and omissions evidence otherwise.  He had a

responsibility to be forthcoming with the information expressly requested and/or to be provided in

his financial statements, and by not listing his outstanding unpaid income taxes therein, the

Defendant led the Plaintiff to believe that there were none.  At the very least, these actions evidence

reckless indifference because the Defendant not only submitted tax returns the Plaintiff contends

were never filed[8] and financial statements that were incomplete and inaccurate, but he also executed

a certification certifying that the December 1, 2004 Financial Statement was complete and accurate

and was provided to "induce [the Plaintiff] to extend its credit from time to time."  TRIAL EX. 21.

As such, this element of § 523(a)(2)(B) is likewise met.

### III

In summary, the court finds that the Plaintiff has proved by a preponderance of the evidence

that, in order to induce the Plaintiff to loan him money, the Defendant, with the intent to deceive and

with reckless indifference, provided the Plaintiff with financial statements and tax returns which

were materially false and upon which the Plaintiff reasonably relied.  Accordingly, the outstanding

debt owed to the Plaintiff by the Defendant for the Purchase Loan is nondischargeable pursuant to

11 U.S.C. § 523(a)(2)(B).  The amount of the Defendant's obligation to the Plaintiff is not subject

to determination by this court and will presumably be resolved by the state court.

---

[8] *See supra* n. 6.

20

A judgment consistent with this Memorandum will be entered.


FILED:  August 25, 2009

                              BY THE COURT

                              */s/ RICHARD STAIR, JR.*

                              RICHARD STAIR, JR.
                              UNITED STATES BANKRUPTCY JUDGE